IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KATHERINE M.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:22cv00227 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

Plaintiff Katherine M. ("Katherine") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Katherine alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess her mental impairments; and (2) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **GRANT** the Commissioner's Motion for Summary Judgment (Dkt. 21) and **DENY** Katherine's Motion for Summary Judgment (Dkt. 17).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Katherine failed to demonstrate that she was

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Katherine filed for DIB in July 2019, claiming that her disability began on May 3, 2018, due to bipolar disorder, depression, and anxiety. R. 62. Katherine's date last insured was determined to be March 31, 2024[3]; thus, she must show that her disability began on or before this

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Katherine's date last insured was initially determined to be September 30, 2020; however, the ALJ's decision indicates it changed to March 31, 2024.

date and existed for twelve continuous months to receive DIB.[4] R. 17, 62; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Katherine's application at the initial and reconsideration levels of administrative review. R. 62–88. On February 24, 2021, ALJ David Lewandowski held a hearing to consider Katherine's claim for DIB. R. 34–61. Counsel represented Katherine at the hearing, which included testimony from vocational expert Chad Kollars. On August 5, 2021, the ALJ entered a decision analyzing her claim under the familiar five-step process[5] and denying her claim for benefits. R. 17–28.

The ALJ found that Katherine was insured at the time of the alleged disability onset and that she suffered from the severe impairments of bipolar disorder, post-traumatic stress disorder, personality disorder, obsessive-compulsive disorder, and cannabis use disorder. R. 20.[6] The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21. The ALJ specifically considered listing 12.04 (depressive, bipolar, and related disorders), listing 12.06 (anxiety and obsessive-compulsive disorders), listing 12.08 (personality and impulse-control disorders), and listing 12.15 (trauma and stress-related disorders). The ALJ found that regarding her mental impairments, Katherine

---

[4] Katherine was 26 years old on the alleged onset date and 30 years old on the date of the ALJ's decision, making her a younger person under the act. R. 62, 28.

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] The ALJ found that all other impairments alleged in the record were non-severe, including Katherine's anemia, hypothyroidism, and obesity. R. 20.

had mild limitations in understanding, remembering, or applying information, and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 21–22.

The ALJ concluded that Katherine retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with non-exertional limitations. R. 22. Specifically, Katherine can understand, remember, and apply simple instructions and perform simple tasks. She can maintain attention/concentration for two-hour segments and is limited to occasionally having interaction with the public and occasionally making work-related decisions independently. Katherine will be off task 10% of the workday. R. 22–23. The ALJ determined that Katherine was unable to perform her past relevant work as an after-school teacher, social service worker, and social service aide, but could perform jobs that exist in significant numbers in the national economy, such as garment bagger, casing splitter, and industrial sweeper cleaner. R. 26–27. Thus, the ALJ determined that Katherine was not disabled at any time from May 3, 2019, through the date of his decision, August 5, 2021. R. 28. Katherine appealed the ALJ's decision, and the Appeals Council denied her request for review on March 10, 2022. R. 1-6.

## ANALYSIS

Katherine alleges that the ALJ failed to properly assess her mental impairments and assess her allegations regarding her symptoms.

**A. Medical History Overview**

1. Medical Treatment and Opinions

Katherine has a history of mental health complaints and treatment, including medications and psychotherapy, even prior to her alleged onset date in May 2018. Katherine had an in-patient hospitalization due to increased mental health symptoms in April 2018, shortly before her

4

alleged onset date, and two in-patient hospitalizations in May 2018, including a multi-week stay from May 17, 2018 through June 13, 2018. R. 321, 364–67. Katherine's June 13, 2018 discharge summary indicates she had stopped taking her medications when she became pregnant 18 months previously, and started developing manic symptoms and psychosis "a few months ago." R. 365. Her diagnoses on discharge were bipolar I disorder, manic with psychotic features, and cannabis use disorder, moderate. R. 367. After her discharge, her treatment progress notes generally indicate symptom improvement with medication. Katherine also started counseling sessions and life skill lessons, including assistance with routine activities of daily living such as cleaning, meal preparation, and money management, along with medication management. R. 525, 1310-1773. At her initial psychiatric evaluation in June 2018, Katherine reported she had been taking her medications as prescribed and had been doing "pretty good" since starting the medications, but with some anxiety and sleep issues. R. 486. Progress notes throughout the relevant period show times of improvement, with a more stable mood, intact memory and normal attention and concentration, though she generally had a depressed mood, and some mental status exams showing a disheveled appearance and depressed and anxious mood. See e.g. R. 667, 676, 691, 716, 941, 949, 964, 1087. At a July 2019 appointment, Katherine reported being very depressed and feeling stressed and anxious as she was going through a divorce. R. 530. By July 2020, she reported stable and improved depression to her provider at a check-up, and in August 2020 she presented with an "upbeat mood" and reported working at an after-school program. R. 1166.

    2. Medical Opinions

State agency psychologists Nicole Sampson, Ph.D. and Stephen Saxby, Ph.D., reviewed the record in November 2019 and April 2020, respectively. Regarding concentration, persistence,

and pace, both found sustained concentration and persistence limitations, but no understanding or memory limitations. R. 70, 85. They found Katherine's ability to complete a normal workweek without interruptions from her psychological symptoms and perform at a consistent pace was moderately limited, but that she can follow 1 to 2 step instructions and concentrate for 2-hour periods to complete a normal workday and can complete a normal work week. R. 70–71, 85. Dr. Sampson further explained that, while Katherine has a diagnosis including bipolar disorder with psychotic features and had two psychiatric hospitalizations in 2018, "with medication, her psychotic features appear controlled" and that overall, she has "come a long way since her hospital discharge in 2018" including working on mental health skill building and becoming independent and self-sufficient through psychiatry and case management. R. 71–72. The ALJ found these opinions persuasive. R. 25–26.

### B. Mental Impairments under SSR 96-8P

Katherine argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P.[7] See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Katherine states that the ALJ failed to properly consider her moderate limitations in concentrating, persisting, or maintaining pace, interacting with others, and adapting or managing herself, and failed to explain how the RFC accommodates these limitations. Katherine emphasizes that the ALJ failed to explain his conclusion that she can maintain attention/concentration for two-hour segments and would be off task 10% of the workday. The Commissioner counters that the RFC is supported by substantial

---

[7] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

evidence, including the opinions of the state agency psychologists. The Commissioner also emphasizes that, during the relevant period, Katherine worked 20 to 25 hours a week as an "after-school teacher" which constituted skilled work, was accepted to Liberty University's graduate program, and none of her treatment providers indicated she was not capable of continuing working or attending graduate school.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarified that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020)[8] (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio

---

[8] Instead, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the

does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. Indeed, "a categorical rule, applying to every case" is not often appropriate in these circumstances; instead, the inquiry "as is usually true in determining the substantiality of evidence, is case-by-case" taking into account the whole of the administrative record and deferring to the ALJ. Biestek, 139 S. Ct. 1148 (discussing a vocational expert's refusal of a request for underlying data).

In support of her argument that the ALJ failed to explain how the RFC accommodated her moderate limitations in concentration, persistence, or pace, Katherine claims that the ALJ ignored evidence in the record, specifically Katherine's "racing and grandiose thoughts" in September 2020, and that she received assistance with activities of daily living "including cleaning, meal preparation, and money management" several times a week through May 10, 2021." Pl.'s Br. at 20, Dkt. 18 citing R. 992, 1174, 1310–1773. However, the September 2020 record was not ignored by the ALJ, who referenced it generally when noting that Katherine attended individual outpatient psychotherapy (R. 24). The ALJ was not required to specifically discuss this record, and the ALJ here, provided a detailed and accurate summary of Katherine's medical treatment, including her hospitalizations in April, May, and June 2018, and subsequent mental health treatment. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (noting "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision") (citation omitted). This September 2020 record indicates that Katherine was upset about an insurance issue and is "having issues with racing thoughts and knows her thoughts are grandiose in nature." R. 1174. The September 2020 record also states that Katherine has "made great strides" and that her attention/concentration are normal. R. 1174–75.

---

"medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)).

Likewise, the ALJ acknowledged that Katherine received assistance with activities of daily living, specifically noting that she "is working on life skills such as preparing meals and performing household chores including cleaning" (R. 25) and referencing treatment notes from Intercept Youth Services multiple times in his opinion. For example, the ALJ references "progress notes from May and June 2020, where Katherine was "clean, calm, friendly, and pleasant" as well as "open and communicative" and in November 2020, where Katherine was having frustrations, but still communicating openly. R. 24–25 citing Progress Note from Ex. 22F, Intercept Mental Health Skill-Building. Contrary to Katherine's claim that the ALJ ignored these records, the ALJ concluded from his review of these records that Katherine's mental health treatment was effective in managing her symptoms.

Katherine argues the ALJ failed to explain how the RFC accommodated her moderate limitations in interacting with others, and specifically how her part-time work, and July 2020 treatment record supported a restriction to occasional interaction with the public, but no restriction on interaction with coworkers or supervisors. Katherine again references the September 2020 record, as well as records indicating a disheveled appearance, and her assistance with activities of daily living. Of course, as discussed above, the ALJ did not ignore either the July 2020 treatment record, or her assistance with daily living. The ALJ also did not ignore records indicating a disheveled appearance, as he specifically noted that mental status examinations from July to September 2019, as well as July 2020, show a disheveled appearance. R. 24. The ALJ acknowledged Katherine's testimony from the hearing where she reported problems being around others and difficulty handling changes in routine. R. 23. The ALJ also provided an accurate and appropriate longitudinal summary and analysis of Katherine's mental health treatment, which, with treatment and medication generally improved after her 2018 in-

patient hospitalizations. See e.g. R. 24. The ALJ's decision is further supported by the state agency physicians, whom he found persuasive, who concluded that while Katherine's ability to interact with the general public is moderately limited and she would work best in a setting with limited contact with the general public, her ability to accept instructions and respond appropriately to criticisms from supervisors and get along with coworkers or peers was not significantly limited. R. 85–86.

Katherine makes similar arguments regarding her moderate limitations in adapting or managing herself. Katherine again writes that the "ALJ ignored the evidence of record frequently documenting [her] disheveled appearance." Pl.'s Br. at 24, Dkt. 18. However, in support she cites to only two instances, Katherine's Initial and Comprehensive Needs Assessment on July 8, 2019 (R. 530–49) and her Annual and Comprehensive Needs Assessment on July 13, 2020 (R. 1090–1101), both of which the ALJ specifically discussed in his opinion, as follows:

> Although mental status examinations from July 2019 through September 2019 show a disheveled appearance, a depressed and anxious mood, and flat affect, [Katherine] appeared alert and oriented with cooperative behavior, fair communication, appropriate eye contact, coherent speech, logical thought processing, no hallucinations or delusions, no paranoia, intact recent and remote memory, normal attention and concentration, fair insight, and no suicidal ideation.

R. 24 (Regarding July 8, 2019 Initial and Comprehensive Needs Assessment).

> While a mental status examination in July 2020 shows a disheveled appearance and loud speech, [Katherine] appeared alert and oriented with a full affect, cooperative behavior, good communication, appropriate eye contact, and normal attention. A subsequent examination in July 2020 also shows that [Katherine] appeared alert, oriented, and healthy with appropriate dress and grooming, cooperative behavior, good communication, an appropriate mood and affect, appropriate eye contact, coherent speech, normal attention, fair insight, and no suicidal ideation.

Id. (Regarding July 2020 Annual and Comprehensive Needs Assessment).

The medical evidence supports the ALJ's conclusion that, despite her moderate limitations, Katherine could perform the basic mental demands of a full range of work at all exertional levels, but with non-exertional limitations. The ALJ explained why Katherine's moderate limitations were accommodated by the RFC, including discussing the medical treatment record, testimony, and medical opinions. The ALJ explained that the RFC restriction to simple instructions and tasks means that [Katherine] would not be expected to concentrate or persist to perform more detailed or complex instructions or tasks. The ALJ determined that she can maintain concentration and attention for two-hour segments while performing simple tasks, with an off-task rate of 10% of the workday, which "assumes [she] would have some loss of productivity from her moderate limitations in concentration, persistence, or maintaining pace." R. 21–22. This determination is supported by the state agency doctors, who both found Katherine could carry out 1 to 2 step instructions and focus and concentrate for 2-hour periods, to complete a normal workday and work week. R. 71. Likewise, the ALJ's RFC limitation to occasional interaction with the public and only occasionally making work-related decisions is supported by the state agency physicians, who concluded she "would work best in a setting with limited contact with the general public" and "little independent decision making." R. 71, 86. The ALJ satisfactorily explained his decision, including by referencing the state agency doctors and the medical record, which showed a "favorable response to treatment." R. 25–26. I find the ALJ's RFC is supported by substantial evidence, and thus, the ALJ also accounted for Katherine's impairments in his hypothetical questions to the vocational expert.

### C. Subjective Allegations

Katherine argues that the ALJ's assessment of her allegations is not supported by substantial evidence. In support, Katherine argues the ALJ erred by concluding that her mental

11

health treatment is effective in managing her symptoms, and in relying on her activities of daily living to show she is capable of working, when these activities are performed intermittently, at her own pace, or with assistance from others, including her caseworkers and co-workers. The Commissioner counters that the ALJ's consideration of Katherine's subjective complaints is supported by the record, highlighting that, during the relevant period, on exam, her attention and concentration have been found consistently normal, she has been able to perform skilled work as an after-school teacher part-time, and has also applied for an been accepted into a graduate program.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[9] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by

---

[9] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ discusses Katherine's medical history and treatment, as well as her own allegations, and the ALJ adequately explained his finding that Katherine's allegations were not entirely consistent with the medical evidence and other evidence in the record. Katherine states throughout her brief that the ALJ ignored the services she received, specifically the "support from a mental health support clinician to work on the life skills of preparing meals and performing household chores . . ." See e.g. Pl.'s Br. at 29. However, as discussed above, this is simply not the case; the ALJ both cited to these records in his opinion, and specifically discussed them, ultimately determining that these records generally supported his finding that mental health treatment was effective in managing Katherine's symptoms.

The ALJ also acknowledged Katherine's testimony at the hearing, including that she has difficulty focusing, concentrating, remembering, and paying attention, her mind will wander after ten to fifteen minutes, she experiences both depressive and manic episodes, and she remains in bed both days during the weekend. R. 23. However, the ALJ found that Katherine's statements about the "intensity, persistence, and limiting effects of these symptoms" are not consistent with the record evidence. R. 23. Contrary to Katherine's argument, the ALJ accurately considered her activities of daily living, including specifically acknowledging that Katherine received assistance with learning life skills, writing that she was "working on life skills such as preparing meals and performing household chores including cleaning." R. 25. The ALJ also accurately reported that she worked as an after-school activities leader part-time and cared for her three-year old daughter during her visitation. Id. Additionally, the ALJ appropriately relied on Katherine's daily activities as just one of several reasons to discount her subjective allegations, along with the

13

objective medical evidence and medical opinions. This is the ALJ's job, to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and her ability to work.  See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Katherine's subjective complaints with substantial evidence, and that Katherine is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

For these reasons, an order will be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

Entered:  April 26, 2023

*Robert S. Ballou*

Robert S. Ballou
United States District Judge